Irineo MONTOYA, Appellant,

v.

The STATE of Texas, Appellee.

No. 69644.

Court of Criminal Appeals of Texas,
En Banc.

May 24, 1989.

Rehearing Overruled June 19, 1991.

Ted Campagnolo, Brownsville, for appellant.

Benjamin Euresti, Jr., Dist. Atty., and Yolanda DeLeon, Asst. Dist. Atty., Brownsville, and Robert Huttash, State's Atty., Austin, for the State.

## OPINION

McCORMICK, Presiding Judge.

Appellant and his codefendant, Juan Fernando Villavicencio, were charged with murdering John E. Kilheffer while in the course of committing and attempting to commit the offense of robbery. Appellant was convicted of capital murder. Punishment was assessed at death.

In his eighth point of error, appellant argues that the evidence is insufficient to show that he was guilty of capital murder. Appellant argues that the evidence shows that he had no intent to either rob or kill the victim. Appellant asserts that at most he is guilty of theft. We disagree. During trial appellant's confession was admitted into evidence. The portion of the confession which we set out below and which was offered into evidence by the

State clearly shows appellant's guilt as a party to the offense:

"My name is Irineo Montoya and I'm known as 'El Ney.' I'm 18 years of age being born on June 3, 1967....

"On Sunday approximately three weeks ago, which I believed it to be November 17, 1985 at approximately 8:30 AM or 9:00 AM in the morning, I walked over to this friend of mines house, ... I know him by first name only as Juan and he is also known by nickname as 'El Piolin.' Anyway, I went to his house so we could go over to the Port of Brownsville Shrimp basin, ...

"... When we got there the Port Guard told us that the Port was close (sic) because it was Sunday and that the Boat Captain's were not in, so he did not let us go into the Port. We then decided to start hitching a ride back to Brownsville.... we managed to stop a man who drove a Cheverolet (sic) Blazer which was black and gray in color, anyway the man who drove the Blazer was a gringo (anglo) who was old I guess he was around 50 years old, he had long gray hair and also had a gray beard.... Anyway he stopped and asked us where we were going, we told him that we were going into Brownsville, so he gave 'El Piolin' and myself a ride.... We then drove toward Brownsville. The Gringo started talking with Piolin and myself in Spanish.

"... We then decided to drive down to the Ringgold Park and cruise around.... 'El Piolin' who sat in the back seat took out a black push button knife and told me in Spanish 'Vamos a Rober al Gringo, ...

"The Gringo, stopped near a resaca that is behind the Park, Juan 'El Piolin' then got off the Blazer and walked over behind the Blazer and took a leak (piss) ... When 'Piolin' came back he opened the drivers (sic) side door where the Gtingo (sic) sat and he took the black knife and started piking (sic) the Gringo with the knife, so the Gringo would move, ... I then grabbed the Gringo, by the neck and went with him to the back seat. 'El Piolin,', ... started to stab the gringo with the kinife (sic) ... But he was cutting him all over on the legs and body, but the Gringo kept fighting us. I than (sic) took out a gun that I had with me but I did not have any bullets inside as the gun did not work. I then begin (sic) to hit the Gringo with the gun, ... 'El Piolin' then drove tp (sic) the river levee near the Rio Grande River by Southmost Area where we drove to some torronjaes (Grapefruit trees) where we stoped (sic) in the trees and took out the Gringo, who was all bloddy (sic), he was still alive when we dragged the Gringo to some trees, ... After we finished robbing the Gringo of a gold chain with a gold cross that he wore on his neck, a gold ring that he wore on one of his fingers, we took off his pants Blue Jeans, and a pair of Tennis shoes I don't remember the color.

"Anyway we wanted to rob him so we took his wallet and 'El Piolin' threw the pants away, we got back into the Gringo's Blazer ... he took out the money that was inside the man's wallet. I believe it was around $80 American Dollars. We then drove over to 'El Piolin's' house where he parked the Gringos Blazer in the alley that is on 12th Street next to a garage that I do not know the name off (sic).
..."

The jury was charged that they could convict appellant if they found that he was "acting alone or with another person." In his confession appellant admitted holding the victim while Juan Fernando stabbed him. Appellant also admitting robbing the victim after he and Juan Fernando had drug the injured victim out of the Blazer. Clearly this evidence shows that although appellant himself did not stab the victim he aided Juan Fernando in murdering the victim and later in robbing the victim. V.T.C.A., Penal Code, Section 7.02(a)(2). Viewing the above evidence in the light most favorable to the verdict, we find the evidence sufficient to support appellant's conviction for capital murder.

■ In his tenth point of error, appellant argues that the trial court should have

entered an acquittal after the State introduced into evidence appellant's exculpatory statement and then failed to disprove it. Appellant maintains that the State introduced appellant's entire confession into evidence and thus was bound to disprove the exculpatory material contained in the unhighlighted portions of the confession.

It has long been the rule that when the State introduces a defendant's confession it is bound by any exculpatory portions of the confession unless it otherwise disproves the exculpatory facts beyond a reasonable doubt. *Cannon v. State,* 691 S.W.2d 664 (Tex.Cr.App.1985); *Palafox v. State,* 608 S.W.2d 177 (Tex.Cr.App.1979).

Our reading of the record in this case leads us to two conclusions: first, the *Palafox* rule is inapplicable to the instant case because the State did not introduce into evidence any exculpatory portion of appellant's confession; second, appellant, in his brief has seriously misrepresented the record. The record reflects that during the State's direct examination of Sgt. Luis Martinez of the Cameron County Sheriff's office, the following occurred:

"MR. MOSBACKER [prosecutor]: We offer the statement, Your Honor, those portions highlighted.

"MR. CANTU [defense attorney]: Objection.

"THE COURT: The objection is overruled.

"MR. MOSBACKER: 64a, Your Honor.

"THE COURT: On 64a the State is offering into evidence only those portions that are marked in yellow on the statement, and they are received. (State's Exhibit No. 64a was received in evidence.)

"MR. MOSBACKER: Your Honor, may I have the witness read the highlighted portions at this time to the jury?

"THE COURT: All right.

"MR. CANTU: Under the rules, Your Honor, I am still preserving my objections to the admissibility of the statement.

"THE COURT: Yes.

"MR. CANTU: I ask the jury be allowed to hear all of the document.

"THE COURT: You can offer the rest of it. You are offering the rest of it?

"MR. CANTU: I'm still preserving my objection.

"THE COURT: All right.

"BY MR. MOSBACKER:

"Q. Mr. Martinez, would you please read the entire statement including the highlighted portions?

"MR. CANTU: I'm sorry. What were those instructions?

"THE COURT: He's going to read the whole statement.

"MR. MOSBACKER: Your Honor, it's all—In other words, at this time I would ask that he read the entire statement, keeping in mind for the jury's information that we're only offering the highlighted portions when they get to see the statement themselves.

"THE COURT: All right. Proceed."

Thereupon Sgt. Martinez read the entire statement to the jury.

Evident from the above exchange is the fact that it was appellant and not the State who was offering the unhighlighted portion of the confession into evidence. Thus the rule in *Palafox* is inapplicable to the instant case. Although the procedure used in this instance was unorthodox in that at the time the case was tried the usual procedure was to wait until cross-examination to introduce the remainder of the confession, it is apparent that it was defense counsel's intention to introduce that portion of the confession which was not introduced by the State. See Article 38.24, V.A.C.C.P. (1985) (repealed effective September 1, 1986 and now embodied in Tex.Rules Crim.Evidence, Rules 106 and 107). A reading of the highlighted portion of the confession which was previously set out in our discussion of appellant's eighth point of error reveals nothing which exculpates appellant. Based on all of the above, we hold that the trial court did not err in denying appellant's request for acquittal.

Appellant also argues that the court committed fundamental error in not instructing the jury that exculpatory statements introduced by the State must be regarded as

true unless disproved. Appellant concedes that he did not request such an instruction.

We have already concluded that the portion of the confession introduced into evidence by the State did not contain any exculpatory material. Thus there was no need for such an instruction. *Cannon v. State,* supra; *Daniel v. State,* 668 S.W.2d 390 (Tex.Cr.App.1984). Appellant's eleventh point of error is overruled.

■ In another point of error dealing with the court's charge, appellant argues that the court erred in failing to instruct the jury on the law regarding circumstantial evidence. An examination of the court's charge shows that the jury was properly instructed on the presumption of innocence, the State's burden of proof, and the requirement that appellant be acquitted if there was a reasonable doubt of his guilt. It has been the position of this Court that if a jury is properly instructed in these areas, a charge on circumstantial evidence is no longer required. *DeLuna v. State,* 711 S.W.2d 44 (Tex.Cr.App.1986); *Mulder v. State,* 707 S.W.2d 908 (Tex.Cr.App.1986); *Hankins v. State,* 646 S.W.2d 191 (Tex.Cr. App.1983) (Opinion on State's Motion for Rehearing). This point of error is overruled.

■ The indictment in the instant case alleged in pertinent part that:

"Irineo Montoya, ... and Juan Villavicencio, ... did then and there unlawfully, intentionally and knowingly cause the death of John E. Kilheffer, the deceased, by stabbing the deceased with a knife, which then and there in the manner of its use or intended use was capable of causing serious bodily injury or death, and the said defendants were then and there in the course of committing and attempting to commit the offense of robbery of John E. Kilheffer, ..."

The trial court's charge to the jury contained a number of different abstract instructions and paragraphs applying the law to the facts. Paragraphs 6 and 7 applied the law of parties to the instant case—"acting alone or with another person." Paragraph 8 contained the abstract law of parties. Paragraph 9 contained the law pertaining to conspiracy:

"9.

"If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, then all conspirators are guilty of the felony actually committed, though having no intent to commit .it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out the conspiracy. Capital Murder, murder, robbery, and attempted robbery are felonies.

"By the term 'conspiracy' as used in these instructions, is meant an agreement between two or more persons, with intent that a felony be committed, that they, or one or more of them, engage in conduct that would constitute the offense. An agreement constituting a conspiracy may be inferred from acts of the parties.

"10.

"Now, if you find from the evidence beyond a reasonable doubt that Irineo Montoya ... and Juan Villavicencio ...: entered into an agreement to commit the offense of robbery, as above defined, of John E. Kilheffer, and pursuant to that agreement, they did carry out their conspiracy and that on or about the 17th day of November, 1985 in Cameron County, Texas, while in the course of committing such robbery, Juan Villavicencio ... intentionally caused the death of John E. Kilheffer, by stabbing him with a knife with the specific intent to kill John E. Kilheffer, and that the defendant Irineo Montoya ... pursuant to the conspiracy, if any, with the intent to promote and assist Juan Villavicencio ... in the commission of said robbery, then and there, at the time of the stabbing, was acting with and aiding, or attempting to aid, Juan Villavicencio ... in the execution of the robbery of John E. Kilheffer, if any, and that the stabbing of John E. Kilheffer was committed in furtherance of the

conspiracy, if any, of Irineo Montoya .. and Juan Villavicencio ... to rob John E. Kilheffer, and that the stabbing of John e. Kilheffer, if any, was an offense that should have been anticipated as a result of the carrying out of the conspiracy, then you will find the defendant, Irineo Montoya aka 'El Ney', guilty of Capital Murder.

"Unless you so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant, Irineo Montoya ... of Capital Murder."

Appellant argues that the inclusion of the theory of conspiracy in the court's charge over his objection constituted fundamental error because the offense of conspiracy had not been alleged in the indictment. He reminds us that criminal conspiracy is an offense under V.T.C.A., Penal Code, Section 15.02, and argues that since he had no notice he was being charged with the offense of criminal conspiracy, the jury was erroneously instructed on an alternate theory of conviction.

Appellant is mistaken in his argument. The court's charge did not instruct the jury to consider whether appellant was guilty of the separate offense of criminal conspiracy as set out in Section 15.02, supra. Rather the court's charge merely contained an alternative "parties" charge as provided in V.T.C.A., Penal Code, Section 7.02(b). That section provides as follows:

"(b) If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy."

■ It is well accepted that the law of parties may be applied to a case even though no such allegation is contained in the indictment. *English v. State*, 592 S.W.2d 949 (Tex.Cr.App.1980); *Pitts v. State*, 569 S.W.2d 898 (Tex.Cr.App.1978). This rule applies not only to the law of parties found in Section 7.02(a)(2) but also the law of parties found in Section 7.02(b). *Leger v. State*, 688 S.W.2d 130 (Tex.App.—Beaumont 1985, no petition). Our examination of case law shows that the theory of criminal responsibility set forth in Section 7.02(b) has often been applied in capital murder cases. *Wallace v. State*, 618 S.W.2d 67 (Tex.Cr.App.1981); *English v. State*, supra; *Ruiz v. State*, 579 S.W.2d 206 (Tex.Cr.App.1979); *Wilder v. State*, 583 S.W.2d 349 (Tex.Cr.App.1979); *Rogers v. State*, 662 S.W.2d 13 (Tex.App.—Tyler 1983, petition refused); *Koonce v. State*, 654 S.W.2d 705 (Tex.App.—Houston (14th Dist.), petition refused).

In the instant case, the evidence, as demonstrated by appellant's confession set out above, clearly supported the submission of a charge on criminal responsibility pursuant to Section 7.02(b). Appellant's sixth point of error is overruled.

■ In his ninth point of error, appellant argues that the court erred in not sentencing him to a life sentence after the jury notified the court that it could not reach a verdict. The record reflects that the jury began its deliberations on punishment at 1:00 p.m. on June 17, 1986. At 2:40 p.m., a hearing was convened outside the presence of the jury at which time the trial read two notes received from the jury. The first note read:

"We have not been able to reach a unanimous decision on yes or no."

The second note read:

"We are awaiting further instructions. We are all definite in our decisions."

The court prepared a response which asked the jury to indicate the numerical vote of the jury. Appellant objected on the basis that because the jury was unable to reach a verdict, he should be sentenced to life imprisonment in accordance with Article 37.071(e), V.A.C.C.P. He also argued that any further communication by the court with the jury would amount to an instruction by the court on the way the jury should vote. The court overruled appellant's objections.

In response to the trial court's note the jury responded that it was divided nine to three on Special Issue No. 1 and ten to two on Special Issue No. 2. Appellant again objected and asked that he be given a life sentence. The State argued in response that since the jury had only been deliberating for a period of less than two hours that they should be instructed to continue their deliberations. At 2:59 p.m., over appellant's objection, the court sent the following note to the jury:

"Would you please deliberate for another 30 minutes to see if you are able to reach an answer to the special issues in accordance with the Court's instructions and please report to me after that."

At 3:41 p.m., the court was notified that the jury had reached a verdict.

Appellant is correct that Article 37.-071(e), supra, provides that if the jury is unable to answer any special issue, the defendant is to be assessed a life sentence. However, Article 37.071(e), supra, must be read in conjunction with Article 36.31 V.A. C.C.P., which provides that:

"After the cause is submitted to the jury, it may be discharged when it cannot agree and both parties consent to its discharge; or *the court may in its discretion discharge it where it has been kept together for such time as to render it altogether improbable that it can agree.*" (emphasis added)

Length of time that the jury may be held for deliberation rests in the discretion of the trial judge. Unless the record reveals that the trial court abused its discretion in holding the jury for deliberations, reversal is not mandated. *DeLuna v. State,* 711 S.W.2d 44 (Tex.Cr.App.1986); *Andrade v. State,* 700 S.W.2d 585 (Tex.Cr.App.1985). *Muniz v. State,* 573 S.W.2d 792 (Tex.Cr. App.1978).

This Court has considered situations very similar to the instant case in the past. In *Marquez v. State,* 725 S.W.2d 217 (Tex.Cr. App.1987), the jury sent a note indicating a deadlock after only two hours and twenty-five minutes of deliberation on the capital murder special issues. After being instructed to continue their deliberations, the jury deliberated an additional forty minutes before reaching a verdict. We held that considering that Marquez was on trial for capital murder and the relatively short period of deliberation on punishment, the trial court did not abuse its discretion.

In *Andrade,* after considering the nature of the case, also a capital murder case, we found no abuse of discretion where after four and a half hours of deliberation, the jury notified the court they could not agree on an answer to the first special issue. The judge instructed the jury to continue their deliberations and a verdict was reached after approximately eight more hours.

We also found no abuse of discretion in *DeLuna* where the record reflected the jury had deliberated on the special issues from sometime before lunch until shortly before dinner the same day when they informed the court that they could not reach an answer to the second special issue. After questioning the jurors as to whether they thought they could reach a verdict if given more time, the trial court asked them to continue their deliberations. Sometime that evening the jury returned with affirmative answers to both special issues.

We find no abuse of discretion in the instant case where prior to informing the jury that they could not reach a unanimous verdict, the jury had only deliberated for one hour and forty minutes.

In the same point of error, appellant asserts that the judge's instruction to deliberate for thirty more minutes constituted an "Allen" charge because it coerced the jury into thinking that they had only thirty minutes in which to reach a unanimous decision. He further argues that the fact that they reached their verdict some thirty-three minutes reflects that pressure. We disagree.

An "Allen" charge is one given to a deadlocked jury which indicates to a juror that some deference is owed to the opinion of the majority of the other jurors. *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). The instruction in the instant case directing the jury to deliberate thirty more minutes cannot be con-

strued to be a coercive "Allen" charge. The trial judge's instruction did not pressure the jurors into reaching a verdict nor did it contain any additional instructions as to the law. *Muniz v. State,* supra. Appellant's point of error is overruled.

In the next five points of error, appellant complains of error which he asserts occurred during the voir dire examination of the prospective jurors. Before we discuss the merits of appellant's arguments, it is important to remember that we review the voir dire from a cold record. Recognizing that the trial judge has the opportunity to view the venireman's demeanor with all that that encompasses, we are bound to affirm the trial court's excusal of a prospective juror if there is any adequate basis in the record to support the trial court's decision. *Livingston v. State,* 739 S.W.2d 311 (Tex.Cr.App.1987); *Barnard v. State,* 730 S.W.2d 703 (Tex.Cr.App.1987); *Gardner v. State,* 730 S.W.2d 675 (Tex.Cr.App. 1987).

■ In points of error one, three and four appellant urges that the trial court erred in excusing three jurors upon the State's challenge for cause. Appellant's first point of error concerns venireperson Sylvia Garcia Duran. The record reflects that Duran equivocated throughout her voir dire examination on the question of whether she could follow the trial court's instruction and not consider the defendant's failure to testify in her deliberations.

Initially the record shows that Duran did not understand that a defendant had the right not to testify. After the prosecutor explained to Duran that a defendant did not have to testify, the following occurred:

"Q. Yes. I'm telling you he does not have to take the stand and testify. He does not have to present any evidence in the case. Would you hold it against him if he did not present any evidence?

"A. I wouldn't know.

"Q. You wouldn't know?

"A. I wouldn't know. I guess—

"Q. In other words, when you went back there in the jury room and the defendant did not testify, could you just say, 'Well, I'm going to decide the case on the evidence, like the judge told me, and not even consider the fact that he didn't testify'? Could you decide the case on the evidence that was given to you, or would you consider the fact that he didn't testify?

"A. I think I would probably consider that.

"Q. Even if the judge told you you're not supposed to do that?

"A. Well, then, again, I would say that it depends on the evidence.

"THE COURT: You could follow the Court's instructions. If I told you, 'Don't consider that, don't mention it, don't even think about it,' could you follow my instructions?

"VENIREMAN DURAN: If that's the rule, yes.

"THE COURT: That would be the instruction. That's what I would be telling you. 'Just consider the evidence.' Could you follow the Court's instructions? Could you?

"VENIREMAN DURAN: It's hard.

"THE COURT: Well, I know that. Nothing here is easy. I need to know that if I tell you to do something you're going to do it. Are you saying, 'Judge, that may be the law but I just can't follow it'?

"VENIREMAN DURAN: That's why I say that, because if you don't think that there's enough evidence—

"THE COURT: No, no, no. I'm going to tell you in this case ... I would say, 'In this case the defendant has elected not to testify, and I'm instructing you that when you go back to deliberate you cannot refer to that fact, you cannot allude to it, consider it, for any purpose whatsoever. You just decide the case on the evidence you heard here.' Now, can you follow that instruction?

"VENIREMAN DURAN: I guess so.

"THE COURT: Well, I need to know. Yes or no. Can you follow the instruction? If I tell you that's the law, that's what you have to do.

"VENIREMAN DURAN: It's just that how do you know that—I don't know.

"THE COURT: I don't know what the evidence is going to be. Now, if you listen to just the evidence and you say, 'Well, you know, the State didn't prove it; I have to vote not guilty.' Or you say, 'The evidence is there; I vote guilty.' But just don't consider whether he testified or not; just on what you heard here. Can you do that?

"VENIREMAN DURAN: I would say no."

The court then turned the questioning over to defense counsel who began by explaining the history and purpose behind the Fifth Amendment. After his initial explanation, the following occurred:

"Q. ... And if a defendant doesn't want to testify you can't use it against him. You can't think about it because you have to decide the case on the evidence; all right? Do you have any problem with that?

"A. (Shaking head negatively.)

. . . . .

"Q. So if I told you,—and the Court told you while ago—'Ladies and Gentlemen, you are to decide this case based on the facts presented and you are not to consider in your decision whether the defendant has testified,' do you think you could follow the judge's instruction?

"A. I don't know.

"Q. You don't know.

"A. No.

"Q. What question do you have? Are you confused on what I've explained to you?

"A. Well, no. It's just my personal belief. That's it.

"Q. And you feel that you could not set that aside and, just based on the facts of the case, decide it and not consider whether a defendant has or not testified?

"A. (No response.)

"Q. Huh?

"A. I think it's—Do I have to answer that?

"Q. Well, would you like me to put it to you another way, give you another example?

"A. Because if I feel like that he's supposed to testify, you know, I feel he should.

"Q. Well, I can understand that. I can understand that. It's not quite what you're being asked. Judge Chavez told you that he would instruct you in a given case you would be on, not this one but some other case, he would tell you that you had to decide whether the person is guilty or not guilty based on what you heard from the witness stand, witnesses, the evidence, and things like that, and that you had to be convinced beyond a reasonable doubt. You understand that?

"A. (Nodding head affirmatively.)

. . . . .

"Q. The Court would also instruct you not to consider, when you're deciding the guilty or not guilty, whether the person has or has not testified, because like I said, that's the Fifth Amendment right. That has nothing to do with the case. You have to decide it. It's the State's accusation and they have to prove it. You would have to follow the Court's instruction. Could you do that?

"A. Yes."

At that point defense counsel concluded his questioning. When the prosecutor attempted to question Duran again he was cut off by the judge who said he was not satisfied that Duran could follow the court's instruction. He then asked the prosecutor if he would like to challenge Duran for cause. When the prosecutor responded affirmatively, the judge excused the Duran over defense counsel's objection.

Article 35.16(b)(3), V.A.C.C.P., authorizes the State to challenge for cause any venireman who has a bias or prejudice against "any phase of the law upon which the State is entitled to rely for conviction or punishment." Although Duran's last answer seems to indicate that she could follow the trial court's instructions and not consider a defendant's failure to testify, the bulk of

the voir dire examination shows that Duran was confused, hesitant and that she personally believed a defendant should testify. Reviewing the *entire* voir dire examination as we must, *Clark v. State*, 717 S.W.2d 910 (Tex.Cr.App.1986), and giving due deference to the trial judge who was in a position to evaluate the venireman's comprehension of the questions, the venireman's sincerity and the venireman's demeanor, we find an adequate basis in the record to support the trial court's conclusion that Duran would not be able to follow the law in this area.

In his third and fourth points of error, appellant complains that venirepersons Alma Caballero and Alberico Guajardo were excused in violation of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). As we noted in *Smith v. State*, 744 S.W.2d 86, 87 (Tex.Cr.App. 1987), *Witherspoon* is no longer the standard for determining whether a challenge for cause by the State has been improperly granted. The standard we now use is that enunciated in *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985): A juror may not be challenged for cause based on his views about capital punishment *unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.*

■ Alma Caballero initially equivocated in voicing her feelings as to the general question of whether the death penalty would be ever justified. However, when the questioning zeroed in on whether she herself could ever answer the special issues affirmatively knowing that a sentence of death would result, Caballero was unyielding in her resolve not to render a "yes" answer. In an attempt to rehabilitate her, defense counsel posed a hypothetical situation to the prospective juror and then asked if she could render affirmative answers to the two special issues. Caballero did reply that based on the evidence alone, she could answer the questions "yes." However, she then immediately qualified her answer:

"A. But you're not talking about sentence him to death; right?

"Q. The question is, could you answer the questions yes based on the evidence in the example that I gave you?

"A. This does not have anything to do with the death or it does?"

When the court intervened and explained that affirmative answers to both questions would mandate him to impose the death penalty, Caballero reiterated that she could not give the death penalty.

Apparent throughout the questioning was the fact that the potential sentence of death would affect how Caballero would answer the special issues. Under the standard enunciated in *Wainwright*, the trial court acted properly in granting the State's challenge for cause. Appellant's third point of error is overruled.

■ In his next point of error, appellant argues that prospective juror Alberico Guajardo was improperly excused in violation of *Witherspoon v. Illinois.* Appellant is mistaken as to the reason Guajardo was excused. The record shows Guajardo was excused because he could not understand English. Prior to the commencement of his voir dire examination, Guajardo had informed the bailiff that he needed the assistance of an interpreter. During questioning by the prosecutor Guajardo testified that he had a limited understanding of English. Although the prospective juror was able to voice his opposition to the death penalty, the record reflects that he became confused when the prosecutor attempted to explain the procedure at the punishment phase of a capital murder case. When the court questioned him as to whether he had understood the preliminary instructions given to him prior to the beginning of individual voir dire, Guajardo testified that he understood only a small portion of the instructions. Thereupon the trial judge *sua sponte* excused Guajardo over defense counsel's objection.

In *Goodman v. State*, 701 S.W.2d 850 (Tex.Cr.App.1985), the trial judge *sua sponte* excluded the prospective juror pursuant to Art. 35.16(a)(11) because he could not read or write English. Holding that

this *sua sponte* action by the trial court was an erroneous exclusion of a *disqual-ified* juror, this Court found that reversal was mandated only if Goodman could show that he was tried by a jury to which he had a legitimate objection. Since Goodman's only allegation of harm was the State's use of all of its peremptory challenges and since the record failed to reveal that Good-man was tried by a jury to which he had a legitimate objection, this Court found no reversible error.

Applying *Goodman* to the instant case, we also find that the trial court's error in excusing Guajardo *sua sponte* does not constitute reversible error. The record clearly demonstrates that Guajardo had trouble understanding English and thus was excludable under Art. 35.16(a)(11). Appellant's only allegation of harm is that he was not allowed the opportunity to ques-tion Guajardo before the trial court ex-cused him. We find nothing in the record to suggest that appellant was tried by a jury to which he had a legitimate objection. Consequently, we find no reversible error. Appellant's fourth point of error is over-ruled. See *Green v. State*, 764 S.W.2d 242 (Tex.Cr.App.1989).

 In the next two points of error, appellant argues that the trial court erred in denying his challenges for cause. In his second point of error, appellant argues that the court should have granted his challenge of Cheryl Gray because it was clear from her testimony that she had a bias in favor of police officers. During the defense voir dire examination of Gray, she admitted she would have a tendency to believe a police officer's testimony:

"Q. Do you feel that a police officer should be given more credence to what he says by the very nature of the fact that he holds the office of a policeman?

"A. I probably would have more feeling that I would trust him, yes.

"Q. Would you tend to believe him, let's say, if it was a matter between two people saying that they saw some-thing? Would you tend to believe him over that other person because he is a police officer?

"A. Because he is a police officer?

"Q. Yes. By the nature of his office.

"A. Probably, yes.

"Q. Could you consider that a police officer could take that stand and sit there and commit perjury, could lie on the stand?

"A. I guess so. I would not want to believe that.

"Q. Then you couldn't believe it?

"A. It would be difficult.

"THE COURT: Are you saying you wouldn't believe it or you could believe it? Would you consider that he might make a mistake or lie?

"VENIREMAN GRAY: That's what I'm saying. I wouldn't want to believe it but I could believe it. I wouldn't want to, but there's—You know, it's just like you take any other people and you're talking to them. He's not going to have—I would want to believe, because he's a police officer, that I could believe him and trust him in what he had to say. But listening to everybody, you're going to take into account each one of those people and who you believe or not be-lieve.

"THE COURT: What if a real good friend of yours testified to one thing and a police officer came in and testified to something else?

"VENIREMAN GRAY: Well, but you have to take into account that everybody else that comes in tells the truth. You have to say, 'I believe what this one says' or 'I believe what that one says.' If everything else stacked up against him, you know, you have to take into account everything that's said.

"Q. BY MR. CANTU: Well, listen to the words you've said, 'if everything else stacked up against him.'

"A. That's what I said. I would want to believe him, but there's a possibility I may not, depending on everything else that occurs.

. . . . .

"Q. In regard to policemen and a civil-ian, the only point we're getting to here is that when they sit there they

sit there naked, no badge, no gun, no bionic eyes, nothing. They are just citizens. Would you accept them like that or, really, are you saying, 'I'm going to weigh it. But, really, I'll believe the policeman until I see more than one witness different'?

"A. That's what I'm saying.

"Q. That it's not enough to have a shooting match between two guys. If one of them is a policeman you're going to believe the policeman unless that other person has more; right? Is that what you're saying?

"A. (Witness nodding head affirmatively.)

At that point, appellant challenged Gray for cause and the State attempted to rehabilitate her.

"Q. ... Are you saying that you would decide whether to believe a police officer or any other witness based on what the evidence was in the entire case?

"A. That's what I was trying to say.

"Q. And if you have a police officer and a witness that are diametrically opposed you would look at the entire evidence to determine who is more credible?

"A. Yes.

"Q. It wouldn't be just because he was a police officer that you would believe him?

"A. That's what I was saying. You all get us very confused over here. If I have two stories, I probably would want to believe that that police officer was telling the truth and I would probably believe him more than I would the other person.

"Q. But it would depend on the police officer who was testifying?

"A. That's true. And it would depend on all the rest of the evidence that has been coming up.

"Q. In other words, you may have a police officer who you don't believe, you don't like the way he looks, you don't trust him. In other words, could you consider that you might have a police officer up there that you don't trust?

"A. Yes. I stated that also.

"Q. So you're not saying, 'Every police officer I'm going to believe, no matter what, unless I'm shown completely opposite'; you are saying you would weigh each witness as they come. Police officers would you weigh like everybody else, what they testified to, how they testified, and whether it was credible?

"A. Whether it was credible. That's my comment. It depends on all the other evidence that comes forward. But personally I would want to believe that police officer.

"Q. You would want to believe him?

"A. That's right.

"Q. But once the situation came into effect and you were sitting as a juror and you were watching these witnesses testify you would judge them to the best of your ability on how they testify and how their stories went along with the rest of the evidence?

"A. Yes, sir."

The court overruled appellant's challenge for cause and the appellant was forced to use a peremptory challenge on Gray.

Article 35.16(a)(9), V.A.C.C.P., provides that either the State or the defense may challenge a juror for cause if the juror has a bias or prejudice in favor of or against the defendant. In a situation where a prospective juror testifies that he or she believes a police officer would always tell the truth, this Court has construed such a belief to constitute a bias or prejudice against the defendant. *Hernandez v. State*, 563 S.W.2d 947 (Tex.Cr.App.1978). After reviewing the complete voir dire of Gray, we find that the trial court did not abuse its discretion in overruling appellant's challenge for cause. While Gray did initially testify that she would tend to believe a police officer because of the position he or she held, it became apparent by the end of the voir dire examination that in a trial situation she would judge each individual's credibility based on his testimony as it related to the rest of the evidence adduced during the trial. We find Gray's testimony easily distinguishable from the juror in

*Hernandez* who testified that she believed a police officer would always tell the truth. Appellant's challenge for cause was properly overruled. *Gardner v. State*, 730 S.W.2d 675 (Tex.Cr.App.1987). Appellant's second point of error is overruled.

In his fifth point of error appellant argues that the court erred in denying his challenge for cause of Maria Guadalupe Hernandez because she could not accord him his constitutional right against self-incrimination. During questioning by the State, Hernandez testified that she understood a defendant's right not to testify and would not hold it against a defendant if he did not testify.

"Q. ... If the evidence you heard convinces you that he's guilty you can find him guilty whether he testifies or not. But if the evidence you've heard doesn't convince you that he's guilty, if you're not convinced he's guilty from the evidence you've heard, you can't consider the fact he didn't testify as any evidence of his guilt. Do you understand that?

"A. Yes.

"Q. So, would you be able to do that and not hold it against him that he didn't testify even though you might be curious, because you just decide the case based on what you heard, not on what you're guessing?

"A. Yes. Just on what I heard, yes.

"Q. Okay. And not hold it against the defendant if he doesn't testify.

"A. Right."

During questioning by the defense, Hernandez appeared to hedge on her earlier answers.

"Q. Can you sit there and tell us and be as honest with yourself as you can that you could decide a case based solely on the evidence the State presented and that you would not consider the fact that a defendant did not put on any evidence and did not testify?

"A. I could but I'd still keep wondering why he didn't, I guess. Well, I know—

"Q. That's the scary part about wondering. Are you actually considering it, then?

. . . . .

"A. I guess I would be if I would be wondering about it still in the back of my mind while I was looking at all the other evidence that was presented."

At this juncture, the appellant interposed a challenge for cause. The State again questioned Hernandez in an attempt to rehabilitate her.

"Q. ... If a defendant does not testify the judge will instruct you that the law is you cannot consider that as any evidence of his guilt; that you have to decide the case based on the evidence that you heard and not speculate on why he testified or why he didn't.

"A. Okay.

"Q. Could you follow that law and decide the case based only on the evidence you've heard and not consider the fact that he didn't testify? In other words, could you follow the Court's instruction?

"A. Well, not in my own mind I couldn't. I mean I could follow instructions but I would still have that right in the back of my mind. I would keep thinking about it even though I would be saying, 'Well, we're not supposed to think about that.' I'd still be thinking about it.

"Q. Would you consider it as evidence of his guilt? That's what I'm asking, because you can't consider it as evidence of guilt. What I'm saying is, you can't sort of say, 'This isn't beyond a reasonable doubt but I'm going to add on his failure to testify and that will make it beyond a reasonable doubt.' You have to decide the case based on the evidence.

"A. That I could do. The thing that would bother me is, like why didn't he—Oh, how can I explain it? If the evidence was more like towards him being guilty, I guess he would be guilty, then I would keep thinking, 'Why doesn't he try to prove he isn't

guilty if he isn't?' I guess I'm really confused about that.

"Q. I'm not asking you to say, 'Well, the evidence shows he's guilty, you can find him guilty.'

"A. But I mean if the evidence showed he was innocent I wouldn't say he was guilty just because he didn't testify.

"Q. That's what I'm saying. You wouldn't hold that against him and use that as an item of guilt?

"A. No.

"Q. But if he was guilty you would just decide it based on the the (sic) evidence you heard?

"A. Yes.

"Q. You wouldn't use the fact he didn't testify against him, is what I'm asking?

"A. No."

The trial court overruled appellant's challenge for cause and the defense excused Hernandez by means of a peremptory challenge.

Article 35.16(c)(2), V.A.C.C.P. authorizes the defense to challenge for cause any venireman who has a bias or prejudice against any of the law upon which the defendant is entitled to rely. Consequently, if a prospective juror testifies that he cannot afford a defendant his right against self-incrimination, a challenge for cause by the defendant would be proper under Article 35.16(c)(2).

In the instant case, prospective juror Hernandez admitted she would wonder why a defendant would not testify in his own behalf. But when she was pinned down as to whether she could follow the court's instruction and not consider the defendant's failure to testify when making a determination of guilt, Hernandez clearly testified that she could follow the court's instruction. We find that the record supports the trial court's decision. *Satterwhite v. State*, 726 S.W.2d 81 (Tex.Cr.App. 1986). Appellant's challenge for cause was properly overruled.

Next, appellant contends that his confession was not voluntarily made and thus the court erred in admitting it into evidence. Prior to trial the court held a hearing concerning the voluntariness of the confession. After the hearing the trial court entered an order finding that appellant knowingly and voluntarily confessed after being given his statutory warnings pursuant to Article 38.22, V.A.C.C.P. The court also found that appellant was not induced, coerced or threatened in any way to give his confession.

The undisputed evidence shows that appellant was arrested on the night of December 2, 1985 for possession of marihuana. Shortly after his arrest, the police learned of appellant's involvement in the instant offense and placed a hold on him for capital murder. Around 11:15 p.m., Joe Garza, an investigator with the Cameron County District Attorney's office, attempted to interview appellant but after determining that appellant was intoxicated had him returned to the county jail. Appellant testified at the hearing that he was then placed in a padded solitary confinement cell where he was unable to sleep because of a continuously burning light and because he was cold. None of the State's witnesses could verify that appellant had been placed in such a cell but all testified that they had not ordered such a placement. The next morning at approximately 11:30 a.m., appellant was taken to the sheriff's office where he was interviewed by Garza and Sgt. Luis Martinez of the Cameron County Sheriff's office. Appellant's rights were read to him in Spanish by Martinez and appellant acknowledged that he understood them. He was then informed that he was under arrest for capital murder and his rights were again read to him in Spanish. Again appellant acknowledged that he understood them. The investigators then asked appellant if he would like to give a statement. Appellant replied affirmatively. The investigators then obtained the form upon which statements are written and proceeded to read to appellant in Spanish the statutory rights printed at the top of the form. After acknowledging that he understood those rights, appellant began dictating a statement to Sgt. Martinez. As appellant spoke in Spanish, Martinez wrote the statement out in longhand in English. Follow-

ing the completion of appellant's dictation, Martinez read the statement back to appellant in Spanish. Appellant desired to make no changes so Sgt. Martinez then typed up the statement. Thereafter two secretaries from the sheriff's office were called in to witness the signing of the statement. As they watched, Martinez again read the statement to appellant in Spanish. Appellant stated he understood the statement and then signed it. The statement reflects that appellant signed it at 1:30 p.m. Appellant was taken before a magistrate later in the afternoon. Both Martinez and Garza testified that at no time did they threaten, coerce or make any promises to appellant in exchange for his confession.

Appellant testified at the hearing that he was eighteen years old at the time of his arrest. He testified that his educational background consisted of five years of school in Mexico. He testified that the officers coerced him into confessing by showing him a picture of the victim's body and telling him that if he did not confess they would show the picture to a jury and a jury would give him the needle. According to appellant, his rights were never explained to him and although his statement was read to him in Spanish after he dictated it, he did not understand it.

Appellant asserts that the fact that he spent one night in solitary confinement, coupled with the fact that he did not speak English and was not taken before a magistrate until after he confessed, invalidates the voluntariness of his confession.

■ The trial judge is the sole judge of the credibility of the witnesses in a pretrial hearing on a motion to suppress. Absent a showing of an abuse of discretion, the trial court's findings will not be disturbed. *Freeman v. State*, 723 S.W.2d 727 (Tex.Cr. App.1986); *Cannon v. State*, 691 S.W.2d 664 (Tex.Cr.App.1985); *Bonham v. State*, 680 S.W.2d 815 (Tex.Cr.App.1984). As the State correctly points out the trial court's findings are fully supported by the record. The mere fact that appellant may have been placed in solitary confinement certainly does not negate the voluntariness of his statement. Neither does the fact that he

did not understand English. The record demonstrates that the investigators went to great lengths to translate everything several times to appellant in order to ensure that he understood what he was doing. Finally, the mere failure to take a defendant before a magistrate before interrogating him does not invalidate a confession. *Williams v. State*, 692 S.W.2d 671 (Tex.Cr.App.1984). Absent a showing of a causal connection between an accused's confession and the failure to take the accused promptly before a magistrate, the validity of the confession is not affected. *Williams v. State*, supra (and cases cited therein). Appellant has made no such showing in the instant case. We find no abuse of discretion in the trial court's decision concerning the voluntariness of the confession. Appellant's seventh point of error is overruled.

■ In his twelfth point of error, appellant contends that the excusal of prospective jurors by personnel in the district clerk's office without benefit of the district judge hearing the excuses denied his right to a fair trial. Prior to trial appellant filed a challenge to the array alleging that the officers summoning the jurors had willfully summoned jurors in order to secure a conviction in that jurors were improperly excused by individuals in the district clerk's office. At a pretrial hearing held on June 2, 1986 immediately before the voir dire examination of the jury began, it was established that 700 jurors were summoned for jury duty in Cameron County's five district courts and two county courts at law for the weeks of May 27th and June 2, 1986. Pursuant to authority given them by the district judge, the court clerk for the 107th District Court, the district clerk, the chief deputy clerk and the jury clerk "rescheduled" several individuals who requested a postponement in their jury duty. The evidence reflected that sixteen individuals who were summoned for the week of May 27 were "rescheduled." Aurora De La Garza testified that from her paperwork it looked like most of those individuals came in on May 27th and requested to be "rescheduled." The usual practice for those

wishing to be "rescheduled" was for the individual to go talk to the district judge who would then authorize the employee's of the district clerk's office to fill out the proper paperwork. However, occasionally the employees of the district clerk's office would "reschedule" someone without the district judge's specific consent. Of the sixteen people who were rescheduled from the May 27th panel, it was impossible to tell who had talked to the district judge and been excused by him or who had been excused solely by an employee of the district clerk's office. However, De La Garza did testify that some of the sixteen individuals were excused without a district judge hearing their excuses. At the conclusion of the hearing, the trial court overruled appellant's challenge to the array.

We first must determine if appellant made a proper challenge to the array. Article 35.07, V.A.C.C.P., provides that:

"Each party may challenge the array only on the ground that the officer summoning the jury has wilfully summoned jurors with a view to securing a conviction or an acquittal. All such challenges must be in writing setting forth distinctly the grounds of such challenge. When made by the defendant, it must be supported by his affidavit or the affidavit of any credible person. When such challenge is made, the judge shall hear evidence and decide without delay whether or not the challenge shall be sustained."

Article 35.06, V.A.C.C.P., provides:

"The court shall hear and determine a challenge to the array *before* interrogating those summoned as to their qualifications." (emphasis added)

Article 35.12, V.A.C.C.P., sets out the procedure to be followed in testing the qualifications of the jurors:

"In testing the qualification of a prospective juror after he has been sworn, he shall be asked by the court, or under its direction:

1. Except for failure to register, are you a qualified voter in this county and state under the Constitution and laws of this state?

2. Have you ever been convicted of theft or any felony?

3. Are you under indictment or legal accusation for theft or any felony?"

The record reflects that in accordance with Article 34.04, V.A.C.C.P., appellant was served on May 23rd with the list of the names of the persons summoned as prospective jurors for the week of May 27th. Then on May 27th the individuals on the list appeared for jury duty and were qualified in accordance with Article 35.12, supra. It is unclear from the record whether the prospective jurors were divided into panels for the respective courts on May 27th or June 2nd. But the record does show that the panel for appellant's case reported to the trial court on June 2nd. At that time the court made brief remarks about the nature of the case and the parties and then asked the panel to fill out written questionnaires. While the panel was doing this, the court conducted the hearing on appellant's challenge to the array in another courtroom. After overruling appellant's challenge, the court resumed the voir dire examination of the panel. Initially after noting that the jury had been qualified pursuant to Article 35.12, supra, the previous week, the trial court again asked the panel the Article 35.12 questions. Receiving no affirmative responses from the panel, he continued with the voir dire examination.

As we said in *Stephenson v. State*, 494 S.W.2d 900 (Tex.Cr.App.1973), we do not condone the practice of allowing county employees to arbitrarily grant exemptions to jurors without the trial court's knowledge. However, since defense counsel did not bring the challenge to the array to the attention of the trial court until *after* the prospective jurors were initially qualified, we find that appellant waived his opportunity to challenge the array. Article 35.06, supra; *Jackson v. State*, 745 S.W.2d 4 (Tex.Cr.App.1988); *Esquivel v. State*, 595 S.W.2d 516 (Tex.Cr.App.1980).

In addition, after the court had overruled his challenge to the array, appellant's counsel made no effort to attach the absent jurors in compliance with Article 35.01, V.A.C.C.P. *Ward v. State*, 505 S.W.2d 832

(Tex.Cr.App.1974); *Stephenson v. State,* supra. Consequently, appellant is not entitled to complain about prospective jurors being excused. Appellant's twelfth point of error is overruled.

During trial evidence showed that after the victim's body was found, authorities cut off the victim's fingers and sent them to the DPS lab in order that the victim might be identified. Photographs of the victims fingerprints were taken and then compared with fingerprints kept in the DPS files. Through this means, authorities learned the identity of the victim. During trial after this evidence was admitted, appellant made an oral motion asking that he be given a two day continuance for the purpose of having his own experts examine the photographs taken of the victim's fingerprints (the fingers were destroyed by a DPS lab technician on orders from one of the Cameron County investigators). The trial court denied appellant's motion. Appellant now complains that the trial court's refusal to grant the continuance was an abuse of discretion.

■ Because appellant's motion for continuance was neither in writing, Article 29.03, V.A.C.C.P., nor sworn to, Article 29.-08, V.A.C.C.P., we are compelled to find that nothing has been presented for review. *Lewis v. State,* 664 S.W.2d 345 (Tex.Cr. App.1984); *Porter v. State,* 623 S.W.2d 374 (Tex.Cr.App.1981); *Minx v. State,* 615 S.W.2d 748 (Tex.Cr.App.1981). Appellant's thirteenth point of error is overruled.

Having found no reversible error, we affirm the judgment.